UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America | Criminal No. 3:09cr265 (JBA) |
| *v.* | |
| Lut Muhammad, et al. | May 26, 2010 |

RULING ON PENDING PRE–TRIAL MOTIONS

Remaining for trial in this criminal case are charges against four defendants, each of whom is alleged to have engaged in a conspiracy to possess with intent to distribute, and to distribute, crack–cocaine.  Pending before the Court are certain pre–trial motions, all of which will be denied for the reasons that follow.

I.      Background

On August 28, 2009, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2518, the Government applied for, and Judge Kravitz granted the Government, authorization to intercept wiretap communications, i.e., a wiretap of a cell phone.  The authorization was for a 30-day wiretap, and based on information obtained through the wiretap the Government sought and obtained an extension to continue wiretapping that cell phone, as well as to wiretap four other cell phones.

In an indictment returned December 1, 2009, the Government charged Lut Muhammad and six other defendants (Clayton Benjamin, Samuel Lee, Darius McGee, Edgar Lee Powell, Kevin Sims, and Terrence Spann) of "knowingly and intentionally conspir[ing]

together and with one another, to possess with intent to distribute, and to distribute,

controlled substances, namely mixtures and substances containing a detectable amount of

cocaine base ('crack'), a Schedule II controlled substance, contrary to the provisions of [21

U.S.C. § 841(a)(1)]," between June and December 2009.  (Indictment [Doc. #1] at ¶ 1.)  The

Indictment also charges Muhammad with ten substantive counts of possession with intent

to distribute, and distribution of, cocaine base during that time period (Counts 2, 3, 4, 5, 6,

7, 8, 9, 11, and 12), including six counts of such possession/distribution involving five or

more grams (Counts 4, 7, 8, 9, 11, and 12).  Only four defendants are now set to proceed to

trial, which is scheduled for July 2010: Muhammad, McGee, Sims, and Spann.[1]  There are

no substantive counts pending against any remaining defendant except Muhammad.

II.     Motions to Suppress Wiretaps

        A.     Motions As to Muhammad, Sims, and McGee

        Muhammad has moved to suppress evidence obtained through the use of the

wiretap.  He argues that the original wiretap, of Target Telephone 1 (TT–1), was unlawful,

and that because the applications for extension of the TT–1 wiretap as well as the wiretaps

---

[1] Two additional defendants, Caribe Billie and Christopher Horton, were also indicted but not charged as participants in the conspiracy.  Both were charged with, and pleaded guilty to, use of a telephone to facilitate commission of a drug trafficking felony (Billie, Count 13; Horton, Count 14).

Two of the other three defendants charged as Muhammad's co-conspirators (Benjamin and Powell) have pleaded guilty.  The Government dismissed the sole count against Lee, the third defendant.  The indictment charged Benjamin with conspiracy and one count of possession with intent to distribute five or more grams of cocaine base (Counts 1 and 10).  Lee and Powell were each charged only with conspiracy (Count 1).

of Target Telephones 2 through 5 (TT–2, TT–3, TT–4, and TT–5) were based on information illegally obtained through the original wiretap of TT–1, evidence obtained through any of the five wiretaps must be dismissed. (*See* Muhammad's Mot. Suppress TT–1 [Doc. ## 117, 167]; Muhammad's Mot. Suppress TT–1 Extension [Doc. ## 119, 174]; Muhammad's Mot. Suppress TT–2 Through TT–5 [Doc. # 120]; Muhammad's Mem. Supp. Suppress [Doc. ## 118, 168].)   McGee and Sims have moved for the same relief, incorporating by reference Muhammad's motions and arguments. (*See* Sims's Mot. To Incorporate and Suppress, Dismiss, and for Bill of Particulars [Doc. # 186]; McGee's Mot. Suppress [Doc. # 187].)   Thus, the Court's ruling will be applicable to Muhammad, Sims, and McGee.   The defendants agree that if the Court concludes that the initial wiretap of TT–1 was lawful, all pending motions to suppress must be denied.

B.      Standard

Under 18 U.S.C. § 2518, an affidavit in support of an application for a wiretap must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."   18 U.S.C. § 2518(1)(c).   This requirement serves the purpose of ensuring that "'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"   *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).   "To be adequate, this statement must provide 'some basis for concluding

that less intrusive investigative procedures are not feasible,'" *United States v. Howard*, 350

F. App'x 517, 519 (2d Cir. 2009) (quoting *United States v. Lilla*, 699 F.2d 99, 103 (2d Cir.

1983)), and "'generalized and conclusory statements that other investigative procedures

would prove unsuccessful' will not satisfy Title III," *Concepcion*, 579 F.3d at 218 (quoting

*Lilla*, 699 F.2d at 104).  On review, the Second Circuit "grant[s] considerable deference to

the district court's decision whether to allow a wiretap, ensuring only that 'the facts set forth

in the application were minimally adequate to support the determination that was made.'"

*Id.* at 217 (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997)).  The deference

is to the judge who authorized the wiretap.  *See id.* at 217 n.1.  The Second Circuit has

recently elaborated on these standards:

> To be sure, the Government is not required to exhaust all conceivable
> investigative techniques before resorting to electronic surveillance.  "[T]he
> statute only requires that the agents inform the authorizing judicial officer
> of the nature and progress of the investigation and of the difficulties inherent
> in the use of normal law enforcement methods." *United States v. Diaz*, 176
> F.3d 52, 111 (2d Cir. 1999) (alteration and internal quotation marks
> omitted).  "Merely because a normal investigative technique is theoretically
> possible, it does not follow that it is likely.  What the provision envisions is
> that the showing be tested in a practical and commonsense fashion." S. Rep.
> No. 90–1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2190 (citation
> omitted).
>
> Applying this commonsense approach, we have approved of wiretaps in
> complex and sprawling criminal cases involving large conspiracies, *see, e.g.*,
> *United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990) ("[T]he affidavits
> here convincingly established that the Torres Organization was a large scale
> operation which could not be adequately surveilled by traditional
> investigative methods."), as well as in cases with peculiar circumstances that
> made traditional investigative techniques difficult, *see, e.g.*, *United States v.
> Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984), *abrogated on other grounds by*

4

*Salinas v. United States*, 522 U.S. 52 (1997) (noting that the criminal enterprises under investigation "were in a homogenous neighborhood in Brooklyn where normal surveillance was risky").

*Concepcion*, 579 F.3d at 218.

C.    Discussion

The defendants' main argument is that "[i]n this case, normal investigatory techniques were not only adequate, but were extremely effective." (Mem. Supp. Suppress at 15.) The affidavit in support of the application for the initial wiretap of TT–1 includes averments of specific facts showing that less intrusive investigative procedures were not feasible in the Government's investigation of the criminal conspiracy at issue in this case. The investigating law–enforcement officers averred that they had attempted physical surveillance; made use of pen registers or telephone tolls; had made contact with one cooperating witness, who agreed to testify at relevant court proceedings, as well as four confidential informants, who refused to do so; consensually recorded phone calls between Muhammad and the cooperating witness; and used undercover officers and agents.

As the affidavit in support of the application makes clear, these techniques were not going to assist the Government accomplish its task of investigating the substantial conspiracy led by Muhammad. For example, the officers concluded that "physical surveillance . . . is of limited value" by itself because in the months preceding the wiretap application Muhammad "regularly employ[ed] counter–surveillance techniques." On one occasion, Muhammad successfully lured, and almost succeeded in confronting, a surveillance vehicle; on other occasions he changed the location at which he was to meet the cooperating witness or looped multiple blocks, and he told the cooperating witness that he suspected "that 'some people were following me, and I had to close up shop.'" Moreover, the

5

affiant pointed out, it had become clear that physical surveillance would neither "be able to determine the full scope of the conspiracy nor identify all of the individuals participating in the drug enterprise," in particular the conspiracy's "sources of supply."   In light of Muhammad's demonstrated high sensitivity to physical surveillance and his use of counter–surveillance techniques, as well as the limited extent to which physical surveillance would accomplish the investigation's goals, the Government showed that he would likely detect further physical surveillance, thus compromising agents, officers, the cooperating witness and informants, or the investigation itself.

The use of undercover agents also proved unhelpful.   The Government arranged through a confidential informant to have an undercover agent be introduced to Muhammad, but Muhammad was thereafter arrested by Stamford Police Department officers and charged with drug possession, and was out on bond at the time the wiretap application was made. This sequence of events justified the affiant's conclusion, in light of Muhammad's high alert, that subsequent use of that informant would be impossible.

There were also good reasons why the Government did not wish to use the Federal Grand Jury's subpoena power: only one of the five confidential cooperators asserted a willingness to testify in any proceeding, and there was no reason to believe that upon appearing before the Grand Jury the cooperators who had been unwilling to testify would decide to testify fully and truthfully.   Moreover, because the investigation had not yet identified many of the conspiracy's principals, subpoenaing those known to be part of the conspiracy would be fruitless because they would invoke their Fifth Amendment privilege not to testify and the Government did not want to immunize their testimony because it was still considering charging them.   Moreover, there was no indication that they would testify

6

truthfully if immunized, and service of the Grand Jury's subpoena would be counterproductive because it would alert the other members of the conspiracy of the investigation. The same reasons also justified the Government's decision not to conduct unsworn interviews without aide of the Grand Jury's subpoena power with the known conspirators' associates and acquaintances.

The Government also had good reason to believe that use of search warrants would be fruitless. A combination of the investigation's physical surveillance and the affiant–applicant's experience showed that it would be "unlikely that all, or even many, of the principals of this organization would be at any one location when a search warrant was executed," and executing a search warrant without all, or at least most, members of the conspiracies present would alert the other coconspirators and frustrate further investigation. The affiant–applicant also averred that "the subjects frequently keep money and narcotics of the organization in non–subject's residents [*sic*] so that search warrants—even if successful—would not necessarily result in evidence against the principal targets," and the investigation had not, at the time of the application, identified the conspiracy's preferred locations to store the drugs, proceeds, or documents, so the investigators would have no particularly strong reason to believe that execution of a search warrant on the locations of which it did know would yield high–value evidence. Finally, since the pen registers and telephone tolls of which the investigation had taken advantage showed only the fact of telephone usage, but not the content of the conversations, that evidence was of limited value in discovering the identities of Muhammad's coconspirators or the plans for criminal activity.

Essentially, the wall into which the Government's investigation had run when it applied for the wiretap was that it knew that there existed a drug trafficking conspiracy, but it knew too little about the membership of that conspiracy, and Muhammad was on too-heightened alert to possible surveillance, to make additional headway using traditional law–enforcement techniques, which would have disclosed to Muhammad and his coconspirators the existence of the investigation. The confidential cooperators working with the Government either did not know, or were not providing, the names of Muhammad's coconspirators or details about the conspiracy, and the investigation was not far enough along that engaging in techniques that would disclose the existence of the investigation would prove fruitful, since it would leave the Government without evidence of who else was part of the conspiracy. The affidavit in support of the application thus provided sufficient factual information to have supported a determination by Judge Kravitz that the Government was not resorted to wiretapping TT–1 in a "situation[] where traditional investigative techniques would suffice to expose the crime," *Concepcion*, 579 F.3d at 218—particularly in view of the crime under investigation, which was a drug distribution conspiracy of substantial size, *see id.* ("we have approved of wiretaps in complex and sprawling criminal cases involving large conspiracies")—and, therefore, his issuance of authorization for the requested and time–delimited wiretap.

In addition, the defendants argue that the affidavit does not show, as it must, that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a [drug or conspiracy offense]," 18 U.S.C. § 2518(3)(a), that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception," *id.* § 2518(3)(b), or that "there is probable cause for

8

belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person," *id.* § 2518(3)(d). The Court disagrees. The Government's cooperating witness, seeking to make a controlled purchase of crack–cocaine from Muhammad, "received a consensually monitored call from [TT–1]" and "ordered $300 worth of crack from Muhammad." When the cooperating witness was going to the location pursuant to Muhammad's directions, Muhammad called the cooperating witness, again from TT–1, and directed the cooperating witness to another location. This incident alone shows probable cause to believe that Muhammad commonly used TT–1, that he sold crack–cocaine and used TT–1 to do so, and that recordings of his conversations over TT–1 would reveal communications in which he discussed the possession and distribution of crack–cocaine. The affidavit clearly satisfies the commands of 18 U.S.C. § 2518(3)(a), (b), and (d).

Finally, the defendants argue that because the affidavit recounts information obtained between June and August 18, 2009, the wiretap application, dated August 28, 2009, was stale. "[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *Diaz*, 176 F.3d at 109 (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988)). Where the supporting affidavit paints "a picture of continuing conduct, as opposed to an isolated instance of wrongdoing, . . . the passage of time between the last described act and the presentation of the application becomes less significant." *Id.* (quoting same). Here, the affidavit paints such a picture of continuing conduct. The cooperating witness's experience alone bears this out: he arranged controlled purchases of crack–cocaine from

Muhammad—whom he contacted through TT–1—a number of times between June 10th and August 18th.  The Second Circuit has rejected a claim of staleness in a drug–trafficking case where, as here, the affidavit detailed the targeted defendants' relevant criminal activities that took place "within one month of the wiretap application" and where the defendants "used telephones to conduct their illegal drug activities."  *See Diaz*, 176 F.3d at 109–10.  "Moreover, . . . to the extent that there are acts of past criminal activity that in and of themselves might be stale, such acts 'can be sufficient if [an] affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one–time occurrence.'"  *Id.* (quoting *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)).  The affidavit clearly shows that Muhammad's criminal activities were ongoing rather than isolated instances of wrongdoing, and the application detailed criminal activity by Muhammad just ten days before the wiretap application was submitted.  The application was not stale.

Because the affidavit contained "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and in that respect and all other challenged respects complied with 18 U.S.C. § 2518(3), and because the application was not stale, the wiretap application supported Judge Kravitz's issuance of authorization to wiretap TT–1.  The defendants' contentions to the contrary are rejected, and their motions to suppress the evidence obtained through the Government's wiretap of TT–1 will be denied.  Consequently, the defendants' motions to suppress the TT–1 Extension and the wiretaps of TT–2, TT–3, TT–4, and TT–5 will also be denied.

III.    Motion to Dismiss or for Bill of Particulars

Muhammad has moved to dismiss Count One of the Indictment, or in the alternative for a Bill of Particulars with respect to that count (Muhammad's Motion to Dismiss or for Bill of Particulars [Doc. # 169]), and Sims seeks the same relief by having incorporated by reference Muhammad's motion (*see* Sims's Mot. to Incorporate and Suppress, Dismiss, and for Bill of Particulars [Doc. # 186]).  For the reasons that follow, these motions will be denied.

A.    Standards

"The Indictment Clause of the Fifth Amendment 'requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'" *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (quoting *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y. 1982)).  The Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime,'" *id.* (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.), *cert. denied*, 423 U.S. 832 (1975)), finding that they satisfy both the Indictment Clause and Federal Rule of Criminal Procedure 7(c).

> An indictment that complies with certain "basic principles of fundamental fairness" satisfies both the U.S. Constitution and Rule 7(c).  *Russell v. United States*, 369 U.S. 749, 765–66 (1962).  For example, "[i]t is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  We have also stated that "[w]hen an indictment delineates the elements of a charged offense, however concisely, the underlying concerns

11

of proper pleading . . . may be further promoted by a bill of particulars," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992), and that an indictment should "be read to include facts which are necessarily implied by the specific allegations made," *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

*United States v. Adelson*, 237 F. App'x 713, 716 (2d Cir. 2007); *see also United States v. Resendiz–Ponce*, 549 U.S. 102, 108 (2007) ("In *Hamling*, we identified two constitutional requirements for an indictment: 'first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" (quoting *Hamling*, 418 U.S. at 117, alterations in *Resendiz–Ponce*)).

"While a bill of particulars or discovery cannot save a 'defective indictment,' where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense." *Walsh*, 194 F.3d at 45 (quoting *United States v. Panzavecchia*, 421 F.2d 440, 442 (5th Cir. 1970)).

As one district court has recently summarized:

The standard for determining whether a bill of particulars is appropriate is based on necessity: "In deciding a motion for a bill of particulars, '[t]he important question is whether the information sought is necessary, not whether it is helpful.'" *United States v. Heredia*, No. 02 CR. 1246(SWK), 2003 WL 21524008, at *9 (S.D.N.Y. July 3, 2003) (quoting *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)). The purpose of a bill of particulars is to "supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense." *United States v. Sturtz*, 648 F. Supp. 817, 819–20 (S.D.N.Y. 1986). A bill of particulars is appropriate "only where the charges of the indictment

12

are so general that they do not advise the defendant of the specific acts of which he is accused." [*United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)]; *see also United States v. Wilson*, 493 F. Supp. 2d 364, 369 (E.D.N.Y. 2006) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)).

A bill of particulars is not a discovery device and "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see generally United States v. Bellomo*, 263 F. Supp.2d 561, 580 (S.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret evidence for the defendant, or disclose its legal theory.").

*United States v. Mandell*, No. 09 Cr. 662(PAC), --- F. Supp. 2d ----, 2010 WL 1780961, *1 (S.D.N.Y. Apr. 30, 2010).

B.    Discussion

The defendants concede that the conspiracy charged in the Indictment "is charged in a single paragraph and does little more than recite the statutory elements of the crime." (Mem. Supp. at 2.)  The Second Circuit has "consistently upheld indictments" that do just that.  *Walsh*, 194 F.3d at 44; *accord LaSpina*, 299 F.3d at 177.  The defendants argue that the Indictment is nonetheless "fatally defective" because it "fails to provide the defendant[s] with notice of the particular manner and means by which this 'conspiracy' was supposed to operate, of *any* specific acts supposedly taken in furtherance of the conspiracy, or of the respective roles of the alleged co-conspirators."  (Mem. Supp. at 2.)

However, "'in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy.' Thus, to prevail on his claim that the conspiracy count was insufficient, [a defendant] 'must

show that the indictment . . . was not sufficient to identify the offense which he conspired to commit.'" *LaSpina*, 299 F.3d at 177–78 (quoting *United States v. Wydermyer*, 51 F.3d 319, 324 (2d Cir. 1995), internal quotations and alterations omitted).  The Indictment meets this standard, since it clearly identifies the offense which Muhammad is alleged to have conspired to commit: "possess[ion] with the intent to distribute, and . . . distribut[ion of], controlled substances, namely mixtures and substances containing a detectable amount of cocaine base ('crack'), a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, 841(a)(1)."  (Indictment ¶ 1.)  It also specifies the seven–month time–span of the conspiracy (June through December 2009) and sets forth ten counts of possession with intent to distribute, and distribution of, cocaine base during that time period (which counts constitute overt acts as well as substantive counts against Muhammad) and the Government has provided additional material during discovery that sets forth the detail and evidence of the conspiracy in additional detail.  If defendants' motions were to be granted, their specific requests—"[t]he basis for the allegation" regarding the time–span of the conspiracy; the specific dates, times, and places in which they "combined, conspired, confederated, and agreed with the[ir] co-conspirators"; the names of the additional co-conspirators known to the Grand Jury but not named in the Indictment; and "[a]ll overt acts not already identified in the [I]ndictment (*see* Mem. Supp. at 3)—would render the Bill of Particulars a "discovery device" to assist the defendants in their investigation, notwithstanding that a bill of particulars "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense" and "is not designed to: obtain the [G]overnment's evidence; restrict the [G]overnment's evidence prior to trial; assist the defendant's

14

investigation; obtain the precise way in which the [G]overnment intends to prove its case; interpret evidence for the defendant, or disclose its legal theory." *See, e.g.*, *Mandell*, 2010 WL 1780961 at \*14 (citations omitted).

The defendants have shown neither that the Indictment is insufficient under the Fifth Amendment and Rule 7(c), nor that they are entitled to a Bill of Particulars. Their motions to dismiss or for a bill of particulars will therefore be denied.

IV.     Motion to Sever

On May 3, 2010, Muhammad moved to sever his trial from that of the three remaining co-conspirators under Federal Rules of Criminal Procedure 8(a), 8(b), and 14. (Muhammad's Mot. Sever [Doc. # 170].) He argues that the Government has misjoined charged offenses, in violation of Rule 8(a); that the Government has misjoined defendants, in violation of Rule 8(b); and that he is entitled to severance under Rule 14 because the prejudice he will suffer absent severance outweighs the judicial system's interest in efficiency. For the reasons that follow, Muhammad's motion to sever will be denied.

A.     Rule 8(a)

Rule 8(a) does not apply to this case. "[W]here multiple defendants are charged in the same indictment, Rule 8(b) governs any motion for severance based on improper joinder." *United States v. Segura*, No. 3:99cr85(EBB), 2000 WL 1849723, \*1 (D. Conn. Nov. 29, 2000); *see United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988); *United States v. Biaggi*, 909 F.2d 662, 675–676 (2d Cir. 1990); *see also United States v. Shellef*, 507 F.3d 82, 97 n.12 (2d Cir. 2007).

B.     Rule 8(b)

Rule 8(b) provides that an

> indictment or information may charge 2 or more defendants if they are
> alleged to have participated in the same act or transaction, or in the same
> series of acts or transactions, constituting an offense or offenses. The
> defendants may be charged in one or more counts together or separately. All
> defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotations omitted). Courts must "also 'apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder.'" *Id.* (quoting *Shellef*, 507 F.3d at 98 (in turn citing *Turoff*, 853 F.2d at 1044)). "Unless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice." *United States v. Feyrer*, 333 F.3d 110, 113 (2d Cir. 2003) (citations omitted).

Analysis of Muhammad's argument under Rule 8(b) makes clear that joinder is not improper under this rule. Muhammad and his co-defendants are charged with having participated in a single conspiracy—set out in Count One—to possess with intent to distribute, and to distribute, cocaine, and each of the 10 substantive counts against him of possession/distribution specify dates within the date–range of the conspiracy (June through December 2009) that involves the same substance (crack). It is abundantly clear that a conspiracy presents a "common plan or scheme." After all, a conspiracy is "[a]n agreement by two or more persons to commit an unlawful act" or a "combination for an unlawful purpose," *Black's Law Dictionary* 351 (9th ed. 2009), and "[t]o prove a single conspiracy, the

government must show that *each alleged member agreed* to participate in what he knew to be a *collective venture* directed toward a *common goal*," *see, e.g.*, *United States v. Hamilton*, 323 F. App'x 27, 29 (2d Cir. 2009) (holding that evidence at trial supported finding of a single "*overarching conspiracy* to import and distribute cocaine" in light of, *inter alia*, codefendants' engagement "in a *common scheme* to recruit cocaine couriers and arrange cocaine importation and distribution during the entirety of the conspiracy") (emphases added).

"The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)," *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988), and, thus, "[t]he mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense.*" United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) (internal quotation omitted); *United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir. 1976) (holding under Rule 8(b) that "[h]ere joinder of a conspiracy count and the substantive counts arising out of the conspiracy is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common plan"); *see also Segura*, 2000 WL 1849723 at *1 n.1 (denying Rule 8(a) motion because in light of fact that "both the conspiracy charge and [the defendant's] possession charge relate to the possession, distribution, and sale of narcotics, the joined offenses are of 'similar character.' Furthermore, because Pena's possession charge involved two other co-defendants charged in the conspiracy and took place within the time period of the alleged drug conspiracy, the joined offenses are also based, at least in part, on the same transaction.").

17

Notwithstanding that only a single conspiracy has been charged in a single count, Muhammad asserts that "the Indictment . . . contain[s] multiple conspiracies." (Mem. Supp. [Doc. # 171] at 5.)  Muhammad's argument appears to be that the conduct the Government charges Muhammad's six alleged coconspirators—Benjamin, Lee, McGee, Powell, Sims, and Spann—with having undertaken "has nothing to do with [Muhammad's] conduct" (*see id.* at 6), but this is a clear misreading of the Indictment, which expressly charges each of the seven alleged conspirators with being a "member[] of the narcotics conspiracy charged in Count One" (Indictment at ¶¶ 2–4), and which contains substantive charges against Muhammad that involve the same dates and drugs as the conspiracy charge, as noted above. Simply stated, the Indictment alleges only one conspiracy, and Muhammad's contentions to the contrary are incorrect.  Even if it were otherwise, Rule 8(b) permits joinder of defendants even where they are not charged in the conspiracy counts of each other:

> Provided that the defendants are "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," Fed. R. Crim. P. 8(b), members of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy.

*United States v. Rittweger*, 524 F.3d 171, 177–78 (2d Cir. 2008) (citing *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003), *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998), and *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).  Here, Muhammad seeks to sever his trial from two co-defendants, each of whom is charged with only a single crime: that they participated in the same conspiracy as Muhammad.  Whether the Indictment is read naturally, as alleging a single conspiracy, or unnaturally, as alleging more than one conspiracy, this is a case involving allegations of a single common purpose: to possess and

18

distribute crack–cocaine.  Joinder under Rule 8(b) is proper, and Muhammad's motion for Severance will be denied to the extent it relies on Rule 8.

      C.      Rule 14

Muhammad fares no better under Rule 14, which "permits a district court to grant a severance of defendants if 'it appears that a defendant or the government is prejudiced by a joinder.'"  *Zafiro v. United States*, 506 U.S. 534, 535 (1993) (quoting Fed. R. Crim. P. 14). In light of the "preference in the federal system for joint trials of defendants who are indicted together," *id.* at 537, and the "well settled [rule] that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials," *id.* at 540, "Rule 14 does not require severance even if prejudice is shown," *id.* at 538–39.  Instead, where, as here, "defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* at 539.  Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Given the presumption in favor of joinder, the Second Circuit has held that a defendant must establish a risk of prejudice that is "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials."  *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).  Among the factors to be weighed to determine prejudice are

(1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others.

*United States v. Ramos*, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004) (citing *United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)). While "none of these factors is dispositive, each is intended to provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants." *Ramos*, 346 F. Supp. 2d at 570 (citing *Gallo*, 668 F. Supp. at 749).

Muhammad does not address the factors listed above. Instead, he asserts that absent severance he would suffer prejudice for six reasons:

(a) The jury may use the evidence from one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the crime or crimes charged;

(b) The jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not do so;

(c) The prejudice from the joinder of defendants outweighs the interests of judicial economy and efficiency in that the jury will not be able to segregate evidence applicable to each defendant and follow in limine instructions as they apply to each defendant;

(d) The prejudice from the joinder of defendants will be so great that this defendant's right to a fair trial will be effectively denied;

(e) The prejudice from the joinder of defendants will result from the trying of unconnected offenses when there are multiple defendants and there may develop a "Bruton" prejudice if a co-defendant's confession implicates a defendant; and

(f) The prejudice from inconsistent defenses, namely Thompson's potential reliance on a "mental" defense, and prevent the jury from making a reliable judgment about guilt or innocence.

(Muhammad Mot. Sever at 2–3; *see also* Mem. Supp. at 6–7 (repeating some of these assertions but providing no more particularized an argument).)  As an initial matter it bears noting that Muhammad has made no particularized argument about the source, basis, magnitude, or type of prejudice he would suffer aside from the general statements quoted above, and on this ground alone his motion may be denied, because "[t]he defendant must make a 'strong showing of prejudice' in order to support a claim of prejudicial joinder" and prevail on a Rule 14 motion.  *See United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980) (quoting, in parenthetical, *United States v. Kopel*, 552 F.2d 1265, 1272 (7th Cir. 1977)).  Nonetheless, the Court addresses each argument in turn.

The first three arguments are addressed to the ability of the jury to follow instructions, including limiting instructions.  Even if these arguments raised "some risk of prejudice," that prejudice would provide no grounds for relief under Rule 14, since it would be "of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'"  *Zafiro*, 506 U.S. at 540–41 (quoting *Richardson*, 481 U.S. at 211).  The fourth argument is a conclusory generality that provides no grounds for relief.  The fifth invokes *Bruton v. United States*, 391 U.S. 123, 136 (1968), which sets forth a defendant's right under the Sixth Amendment's Confrontation Clause "not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him," *see, e.g.*, *United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995).  Muhammad does not specify why he believes the Government may violate *Bruton* in his trial or with whose testimony, why such a violation would show any prejudice, or how such prejudice would be the result of joinder, but in any event solutions less severe than severance exist to a potential *Bruton* problem.  Although unlike the other potential sources of prejudice Muhammad identifies, a *Bruton*

21

violation cannot be cured by limiting instructions, *see Bruton*, 391 U.S. at 137, "[t]he confrontation problem may be avoided by redacting the codefendant's statement so that it is no longer connected to the nondeclarant defendant," *Kirsh*, 54 F.3d at 1068, or, failing that, the Court could inspect any such hearsay statement before it is proffered and exclude any *Bruton*–violating statement, or the entire statement, *see, e.g.*, *United States v. Ohle*, 678 F. Supp. 2d 215, 227 n.10 (S.D.N.Y. 2010) (rejecting argument that potential *Bruton* violation justified severance under Rule 14, and proposing each of these solutions).   Finally, Muhammad references a possible inconsistent defense resulting from "Thompson's potential reliance on a 'mental' defense," but there is no defendant in this case whose first or last name is Thompson.   In any event, the only count in which Muhammad is joined with other defendants is the conspiracy charge, for which the Government must prove that "*each alleged member agreed* to participate in what he knew to be a *collective venture* directed toward a common goal," *see, e.g.*, *Hamilton*, 323 F. App'x at 29 (emphases added), so any position McGee, Sims, or Spann takes at trial regarding his own mental state would likely not prejudice Muhammad, since the Government must prove Muhammad's agreement, regardless of the evidence of his alleged coconspirators' mental states.

For these reasons, Muhammad's motion for severance under Rule 14 will be denied.

V.    Conclusion

For the foregoing reasons, Muhammad's Motions to Suppress Wiretap of TT–1 [Doc. ## 117, 167], Muhammad's Motions to Suppress Extension of Wiretap of TT–1 [Doc. ## 119, 174], Muhammad's Motion to Suppress Wiretap of TT–2 Through TT–5 [Doc. # 120], McGee's Motion to Suppress [Doc. # 187], Muhammad's Motion to Dismiss Count One or for Bill of Particulars [Doc. # 169], Sims's Motion to Suppress, to Dismiss, and

for a Bill of Particulars [Doc. # 186], and Muhammad's Motion to Sever [Doc. # 170] are all DENIED.

As set forth on the record on May 19, 2010, jury selection remains set for July 7, 2010, and trial is scheduled to begin on July 19, 2010.

IT IS SO ORDERED.


    /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 26th day of May, 2010.